# In the United States Court of Federal Claims

No. 12-554C

(Filed: January 29, 2015)

_____

| | | |
|---|---|---|
| DAVID E. O'BRIEN, | * | Military pay case; Cross-motions for judgment |
| | * | on the administrative record; Jurisdiction – |
| Plaintiff, | * | military pay benefits; Standard of review; |
| | * | *Bannum*; Use of Abbreviated Medical |
| v. | * | Evaluation Board Report Processing was proper |
| | * | under the regulations; Disability evaluation; |
| UNITED STATES, | * | Substantial evidence supported BCNR decision; |
| | * | Navy did not act arbitrarily and capriciously in |
| Defendant. | * | not providing for further disability screening; |
| | * | Constructive service remedy unavailable; |
| | * | Plaintiff's cross-motion denied; Defendant |
| | * | motion granted. |
| | * | |

_____

**OPINION**

_____

*Raymond Jewell Toney*, Emeryville, CA, for plaintiff.

*Michael Damien Snyder*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *Stuart F. Delery*, Civil Division, for defendant.

**ALLEGRA, Judge:**

This military pay case is before the court on the parties' cross-motions for judgment on the administrative record. Colonel David E. O'Brien (Colonel O'Brien or plaintiff) claims, *inter alia*, that the Board for Correction of Naval Records (BCNR) acted arbitrarily and capriciously by not retaining him on active duty for further disability screening. For the reasons that follow, the court **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's cross-motion on the administrative record.

**I.   BACKGROUND**

The administrative record in this case reveals the following:

Colonel O'Brien was commissioned as a United States Marine Corps (USMC) officer on March 18, 1988. He served on active duty until July 2, 2002, and on Active Duty Special Work orders from February 28, 2004, until November 30, 2009.

While serving on active duty in the summer of 1996, Colonel O'Brien was diagnosed with Polycystic Kidney Disease. On July 11, 1997, he received a "flight waiver" concerning the disease.[1] That waiver grants aviators who do not meet the applicable physical standards required by the Navy the ability to continue flying. *See* U.S. Navy Aeromedical Reference and Waiver Guide, Waiver Process-1 (June 22, 2006). On July 1, 2002, Colonel O'Brien made a resignation request and was transferred from active duty to the United States Marine Corps Reserves (USMCR).

Effective July 2, 2002, the Department of Veteran Affairs (the VA) awarded Colonel O'Brien a combined disability rating of fifty percent and substantial monetary compensation for multiple conditions, including a zero percent rating for hereditary polycystic kidney disease.[2] Later, the USMCR, however, examined him and found him to be physically qualified for further active duty, despite his VA disability rating. *See Cronin v. United States*, 765 F.3d 1331, 1339-40 (Fed. Cir. 2014) (describing the differences between the ratings systems and the possibility that differences in ratings may result). Consequently, Colonel O'Brien was simultaneously classified as both a disabled veteran by the VA and a fully qualified officer by the USMCR.[3]

Colonel O'Brien returned to active duty on February 28, 2004, at which time the VA suspended his disability ratings and compensation. Colonel O'Brien's flight waiver, however, remained in effect until he became symptomatic from his kidney disease. His condition unfortunately worsened in June of 2009, at which time he was referred to a urologist for additional testing and possible surgical intervention. On July 29, 2009, Colonel O'Brien underwent a procedure to drain the largest of the cysts on his right kidney. That procedure proved unsuccessful. Further tests were conducted in August of 2009, after which the same urologist recommended cyst drainage. A second procedure was conducted in September of 2009, but that

---

[1] The Armed Forces includes a regular and a reserve component. 10 U.S.C. §§ 101(b)(12); (c)(6) (2006). Members in a regular component may serve on active duty for two to eight years, *id.* at § 505(c), but members in a reserve component may serve on active duty, as well. *Id.* at §§ 10211, 12301(d), 12310, 12314. "Active duty" is "full-time" duty in the active military service of the United States. *Id.* at § 101(d)(1).

[2] The VA supplies ratings of genitourinary system dysfunctions. 38 C.F.R. § 4.115b (1994). As polycystic disease "generally result[s] in disabilities related to renal . . . dysfunctions," the VA's disability ratings for polycystic disease is based upon the level of disability caused by renal dysfunction. *Id.* at §§ 4.115a, 4.115b. A zero percent rating for renal dysfunction (and polycystic disease) is given to a veteran who has "[a]lbumin and casts with history of acute nephritis; or, hypertension non-compensable under diagnostic code 7101." *Id.* at § 4.115a.

[3] "[T]he Navy use[s] a standard of review designed to determine unfitness to perform the duties of office, grade, rank or rating. . . . In contrast, the VA determines disability ratings based upon an evaluation of whether and how an individual's capacity to perform in the civilian world is diminished by a disability." *Champagne v. United States*, 35 Fed. Cl. 198, 211-12 (1996), *aff'd*, 136 F.3d 1300 (Fed. Cir. 1998).

procedure proved unsuccessful. Owing to the pain Colonel O'Brien experienced, and the irritation that the previous procedures caused, the urologist recommended that Colonel O'Brien wait six months before pursuing a more invasive procedure. In August of 2009, Marine Corps Central Command (MARCENT) Force Surgeon submitted a request to Marine Headquarters to place Colonel O'Brien on an initial Limited Duty Period (LIMDU) of six months.

In September of 2009, MARCENT referred Colonel O'Brien to a Medical Evaluation Board (MEB). An Abbreviated Medical Evaluation Board Report (AMEBR), dated September 22, 2009, listed Colonel O'Brien as having two conditions: benign renovascular hypertension and polycystic kidney disease. Commander Allan M. Finley signed the AMEBR, as the Convening Authority (CA), on October 6, 2009. At this time, the USMC granted Colonel O'Brien a "Medical Extension" to remain on active duty through November 30, 2009. Such an extension is for a maximum of 60 days to allow the evaluation of a Marine's condition upon the completion of active service, or to determine if he or she should be retained on LIMDU for possible future processing through the Navy Disability Evaluation System (DES). Colonel O'Brien signed a form, dated September 23, 2009, by which he agreed to remain on active duty beyond his scheduled separation date of September 30, 2009, for the purpose of receiving medical care.[4] He further agreed to remain on active duty in a MEDHOLD[5] status beyond his Expiration of Active Service (EAS).[6]

In October of 2009, Colonel O'Brien was ordered to Naval Air Station Jacksonville to undergo a MEB physical evaluation. The MEB CA was Commander Allan M. Finley, Marine Corps, U.S. Navy, Director of Surgical Services, Naval Medical Center Jacksonville. On October 20, 2009, the MEB examined Colonel O'Brien and diagnosed him with three conditions: adult onset autosomal dominant polycystic kidney disease; hypertension; and chronic pain. The report by the MEB determined that Colonel O'Brien's ability to meet medical retention standards was questionable and the MEB referred him to a Physical Evaluation Board (PEB) for disability processing. An Automated Medical Board Report Cover Sheet was also generated, dated October

---

[4] Administrative Remarks (1070) states: "Per MARADMIN 259/04 par 5, I do not elect deactivation. My initial EAS is 30SEP09. I understand that I have ongoing medical issues that are not yet resolved and I am not waiving my right to stay on active duty to finish my medical treatment. . . . I agree to remain on active duty beyond my EAS/ECC in a medical hold status to receive care for an injury/illness I incurred/aggravated while on active duty."

[5] MEDHOLD status is a "Temporary Limited Duty (TLD) status of a marine to remain on active duty beyond EAS to receive medical treatment for service connected injuries, illnesses and/or diseases based upon CMC (MMSR-4) receipt and approval of a valid AMEB(R) which clearly indicates medical conditions, limitations, prognosis for recovery or the recommendation to process through the Disability Evaluation System (DES) via the PEB." Marine Admin. Message (MARADMIN) 0636-09(3)(A)(10).

[6] EAS is "[t]he day active service terminates, including voluntary extensions of enlistment, convenience of the Government legal (CofGL), or convenience of the Government medical (CofGM), for Marines voluntarily retained on active duty." Marine Corps Separation and Retirement Manual (MARCORSEPMAN) ¶ 1002(22).

20, 2009. That cover sheet included in it "Indicated Disposition: Refer to PEB." It also included the following language, "Memo endorsement upon reevaluation: Member examined this Date. The results and findings are: Member counseled this date of the finding: Fit for Full Duty." The cover sheet was neither signed nor dated by Commander Finley, or any other official.

On November 20, 2009, Captain S. Rineer, Marine Corps, U.S. Navy, the MARCENT Force Surgeon, contacted Captain W.B. Adams, Marine Corps, U.S. Navy, Wounded Warrior Regimental Surgeon, to obtain orders for continuing Colonel O'Brien in a MEDHOLD status. In response to the call from Captain Rineer, Captain Adams indicated that Colonel O'Brien would not be granted any further EAS extensions in order to complete disability processing. Instead, Colonel O'Brien was removed from active duty on November 30, 2009, when his medical extension ended. Colonel O'Brien notes that he was not afforded a notice and an opportunity to be heard concerning the termination of his active duty status.

On November 21, 2010, Colonel O'Brien underwent a laparoscopic cyst decortication at the James A. Haley VA Hospital. This procedure was the completion of the course of treatment originally recommended while Colonel O'Brien was on active duty status.

On March 23, 2011, Colonel O'Brien applied to the BCNR. He raised two basic claims, that: (i) his removal from active duty orders was unlawful; and (ii) he was lawfully entitled to continue his disability evaluation system processing while on active duty orders. Colonel O'Brien requested that his service record be amended to show that he was not released from active duty on November 30, 2009; that he be returned to active duty for further disability screening; and that he receive back pay, allowances and benefits to which he is entitled for the time that had elapsed since he had been released from active duty.

On March 12, 2012, in response to a request made on Colonel O'Brien's BCNR application, Wounded Warrior Regiment, Headquarters Marine Corps, issued an advisory opinion. The opinion noted that "Colonel O'Brien was approved for Medical Extension through 30 November 2009 to allow recovery from acute pain episode brought on by Kidney Cyst Aspiration procedure." It found that Captain Adams had reviewed plaintiff's records and determined that he did not have any unfitting conditions and did not require referral to a PEB. Addressing both MEB reports, it was concluded that neither of the conditions in the AMEBR were considered "unfitting," thereby providing no medical indication for referral from the MEB to a PEB. The advisory opinion noted that Colonel O'Brien had sought, and received, a flight waiver for his condition more than 10 years earlier, and had served over five years of continuous active duty service without ill effect. The opinion found that none of the conditions diagnosed by the board were disabling conditions, making a referral to a PEB unwarranted. The advisory opinion thereby concluded that Colonel O'Brien was not authorized to remain on active duty beyond November 30, 2009.

In a May 4, 2012, letter, Colonel O'Brien responded to the advisory opinion, vigorously disputing the finding that his condition was not caused or aggravated by his active duty service and that they were not "unfitting conditions." He noted that Navy regulations specifically

identified "cystic kidney" as a condition that would warrant referral to a MEB.[7] Colonel O'Brien argued that: (i) his conditions "can be disabling;" (ii) the advisory opinion relied too heavily upon the determinations made by Captain Adams; and (iii) only the PEB can make a determination whether his condition is "unfitting" or "disabling."

On July 19, 2012, the BCNR issued a final decision denying Colonel O'Brien's application. Reviewing the evidence submitted by Colonel O'Brien, the BCNR found that the evidence was insufficient to establish material error or injustice. The BCNR noted, *inter alia*, that "the 0% [VA disability] rating for polycystic kidney disease . . . establishes that the kidney discomfort and other symptoms . . . experienced while on active duty did not amount to an increase in severity of the kidney condition."[8] When Colonel O'Brien was demobilized on November 30, 2009, he was not pending retirement and had not applied for retirement. Colonel O'Brien currently is not retired and does not receive retirement pay. He instead is listed as a member of the USMCR (Inactive Reserve).

On August 30, 2012, plaintiff filed his complaint in this court. Briefing on the cross-motions for judgment on the administrative record was completed on May 20, 2013. Oral argument was heard on January 7, 2014.

## II. DISCUSSION

Before turning to plaintiff's claims, we begin with common ground.

### A. Jurisdiction and Standard of Review

This court has jurisdiction over claims seeking money damages from the United States. 28 U.S.C. § 1491(a)(1).[9] This includes actions for back pay pursuant to the Military Pay Act, 37 U.S.C. § 204, as well as actions for retirement disability benefits, 10 U.S.C. § 1201. *See Metz v. United States*, 466 F.3d 991, 998 (Fed. Cir. 2006); *Hale v. United States*, 107 Fed. Cl. 339, 346 (2012), *aff'd*, 497 Fed. Appx. 43 (Fed. Cir. 2012). This jurisdiction extends to claims for pay and

---

[7] Colonel O'Brien further noted that the VA Rating Schedule for disabilities also identified "Polycystic disease" as a disability to be rated as "renal dysfunction."

[8] In the first paragraph of its decision, the BCNR mistakenly stated: "This is in reference to your application for the correction of . . . your record to show that you were retired by reason of physical disability due to the effects of a back injury you allegedly sustained while performing duty in the Marine Corps Reserve." Plaintiff acknowledges that this reference to a back injury was in error and that he did not request relief based upon that condition.

[9] During briefing on the cross-motions for judgment on the administrative record, plaintiff agreed that this court lacked jurisdiction to determine whether Colonel O'Brien was deprived due process pursuant to the Fifth and Fourteenth Amendments of the Constitution. There is good reason to deny this claim. *See Crocker v. United States*, 125 F.3d 1475, 1476 (Fed. Cir. 1997); *LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995); *Hwang v. United States*, 94 Fed. Cl. 259, 270 (2010), *aff'd*, 409 Fed. Appx. 348 (Fed. Cir. 2011).

benefits that a service member would have received absent a wrongful discharge. *See Holley v. United States*, 124 F.3d 1462, 1465 (Fed. Cir. 1997); *Hale*, 107 Fed. Cl. at 346. The court may also order the correction of military records "as an incident of and collateral to" an award of monetary damages. 28 U.S.C. § 1491(a)(2); *see also Voge v. United States*, 844 F.2d 776, 781 (Fed. Cir.), *cert. denied*, 488 U.S. 941 (1988).

The Federal Circuit, in *Bannum, Inc. v. United States*, 404 F.3d 1346, 1355 (Fed. Cir. 2005), instructed that courts must "distinguish . . . [a] judgment on the administrative record from a summary judgment requiring the absence of a genuine issue of material fact." *Bannum* teaches that two principles commonly associated with summary judgment motions – that the existence of a genuine issue of material fact precludes a grant of summary judgment and that inferences must be weighed in favor of the non-moving party – do not apply in deciding a motion for judgment on the administrative record. *Id.* at 1356. The existence of a question of fact thus neither precludes the granting of a motion for judgment on the administrative record nor requires this court to conduct a full-blown evidentiary proceeding. *Id.*; *see also Gay v. United States*, 116 Fed. Cl. 22, 29 (2014); *Int'l Outsourcing Servs., LLC v. United States*, 69 Fed. Cl. 40, 45-46 (2005). Rather, such questions must be resolved by reference to the administrative record, as properly supplemented – in the words of the Federal Circuit, "as if [the Court of Federal Claims] were conducting a trial on [that] record." *Bannum*, 404 F.3d at 1354; *see also Hatmaker v. United States*, 117 Fed. Cl. 560, 565 (2014); *Gay*, 116 Fed. Cl. at 29; *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 355 (2009).

*Bannum's* approach reflects well the limited nature of the review conducted in military pay cases, including board decisions involving disability benefits. In such cases, this court will set aside the determinations only where a decision is "arbitrary, capricious, contrary to law, or unsupported by substantial evidence." *Chambers v. United States*, 417 F.3d 1218, 1227 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1066 (2005); *see also* 5 U.S.C. § 706(2); *Barnick v. United States*, 591 F.3d 1372, 1377 (Fed. Cir. 2010); *Houghtling v. United States*, 114 Fed. Cl. 149, 158 (2013). In general, although the court might disagree with the BCNR's decision, it cannot substitute its own judgment for that of the board "when reasonable minds could reach differing conclusions on the same evidence." *Heisig v. United States*, 719 F.2d 1153, 1156 (Fed. Cir. 1983); *see also Univ. Camera Corp. v. NLRB,* 340 U.S. 474, 477 (1951); *Hatmaker*, 117 Fed. Cl. at 566; *Keller v. United States*, 113 Fed. Cl. 779, 786-87 (2013), *aff'd*, 565 Fed. Appx. 873 (Fed. Cir. 2014); *Verbeck v. United States*, 111 Fed. Cl. 744, 750 (2013). Nevertheless, "when a correction board fails to correct an injustice clearly presented in the record before it, it is acting in violation of its mandate" and may be viewed as acting in an arbitrary and capricious fashion. *Roth v. United States*, 378 F.3d 1371, 1381 (Fed. Cir. 2004) (quoting *Yee v. United States*, 512 F.2d 1383, 1387 (Ct. Cl. 1975)); *see also Hatmaker*, 117 Fed. Cl. at 565-66; *Keller*, 113 Fed. Cl. at 787; *Peoples v. United States*, 101 Fed. Cl. 245, 262 (2011); *Strickland v. United States*, 69 Fed. Cl. 684, 687 (2006).

### B.     Colonel O'Brien's Claims

Colonel O'Brien makes three basic contentions regarding his transfer from active duty back to the USMCR. First, he contends that the USMC's determination that he was "fit" for

active duty at the time of his transfer was improper and that he should have been evaluated instead by a PEB. Second, Colonel O'Brien asseverates that, by agreeing to be put on active duty for further evaluation, he was entitled to be processed through the DES and that the Navy's failure to do so constituted conduct that was arbitrary, capricious, contrary to regulations and contrary to substantial evidence. Finally, by way of relief, Colonel O'Brien asserts that he should be reinstated on active duty retroactively, entitling him to active duty "back-pay" from the date he was transferred from active duty to the reserves "until completion of his physical disability evaluation process." The court will consider these claims *seriatim*.

### (1) The Abbreviated Medical Evaluation Board Report Processing Was Proper

Colonel O'Brien first argues that, based on his condition and the nature of the medical evaluations he received, he should have been retained on active duty pending completion of the Navy's disability evaluation process and evaluation by a PEB. Colonel O'Brien asserts that various regulations, indeed, required that he be retained on active duty until his medical issues were resolved. He contends that his transfer to the reserves outside the DES was "contrary to law, regulation, or mandatory published procedure of a substantive nature." For the reasons that follow, however, the court disagrees.

While the MEB recommended that plaintiff be referred to a PEB, the recommendation was not acted upon by Captain Adams, Marine Corps, U.S. Navy, Wounded Warrior Regimental Surgeon. Instead, Captain Adams deemed plaintiff fit for duty and demobilization. The BCNR concluded that Colonel O'Brien did not suffer from an unfitting condition at the time of his transfer on November 30, 2009, and that, contrary to plaintiff's claim, there was no requirement or necessity that he be retained on active duty for further evaluation and treatment at that time. To understand this claim better, a brief explanation of the medical disability process employed by the Navy is helpful.

Under that process, an MEB is a "panel of providers attached to one of the medical treatment facilities (MTFs) whose commander or commanding officer (CO) has been expressly designated to hold [a] 'convening authority' for MEBs.'" U.S. Navy Manual of the Medical Dep't (MANMED) art. 18-1(3). "Authority in Navy Medicine to convene MEBs is granted exclusively to the CO of naval medical centers, naval hospitals, naval medical clinics, and the naval ambulatory care centers."[10] MANMED art. 18-3(1). The CA additionally must take action after

---

[10] Under the regulations, "[n]o . . . command or officer may convene an MEB, or take unilateral action to place a member on LIMDU, or refer a member's case to the DON PEB" other than the "COs of naval medical centers, naval hospitals, naval medical clinics, and the naval ambulatory care centers . . . [t]he Chief of Naval Operations (CNO), the Commandant of the Marine Corps (CMC), the Fleet Commanders, the Chief of Naval Personnel (CHNAVPERS), the Commander, Naval Reserve Force (COMNAVRESFOR), the Chief, Bureau of Medicine and Surgery (BUMED), and the OIC, Military Medical Support Office (MMSO)." MANMED art. 18-3(1)-(2).

the MEB is convened. MARCORSEPMAN ¶ 8102(3). Specifically, "[i]f the indicated disposition is to refer the MEB to the PEB, and the convening authority concurs, the MEB is endorsed and forwarded to the PEB." MARCORSEPMAN ¶ 8102(7)(a).[11]

A Medical Evaluation Board Report (MEBR) is a documentary finding resulting from the deliberations of a MEB. MANMED art. 18-1(4). The MEBR will either:

> (a) Recommend placement of an active duty member on a period of temporary LIMDU. (b) Verify that the member is 'fit for duty," after being cleared from LIMDU, and should be able to execute the duties of their respective office. [or] (c) Refer the case to the Department of the Navy (DON) Physical Evaluation Board (PEB).

MANMED art. 18-1(4). "'Fit for Duty' refers to a pronouncement by a physician or by an MEB that a patient previously on light or LIMDU has healed from the injury or illness that necessitated the member's serving in a medically restricted duty status." MANMED art. 18-1(5)(a). As can be seen, the MEBR serves a variety of purposes, one of which is to refer cases to the Navy's PEB. *Id*. at art. 18-12(1). The DES provides a process by which members are evaluated by a PEB for the purpose of determining their fitness to continue Naval service and for potential entitlement to disability retirement benefits. Secretary of the Navy Instruction (SECNAVINST) 1850.4E, ¶ 1004. The regulations, however, do not require that a PEB be held in every case – and that is the fundamental problem with plaintiff's case.

MEBs and the MEBRs should be distinguished from an AMEBR, which is used, *inter alia*, to place a service member on LIMDU. MANMED art. 18-17. The MANMED lists out in the manual a list of criteria a MEBR can cover. MANMED, art. 18-12(3). By comparison, an AMEBR is usually a single page in the file, primarily used to place members in LIMDU status. MANMED art. 18-17(1). A AMEBR that recommends placing a Marine Officer – such as Colonel O'Brien – on active duty status on LIMDU must be approved by headquarters. MARADMIN 0636-09 (3)(A)(17)(B). AMEBRs may only be referred for PEB evaluation by service headquarters. SECNAVINST 1850.4E, ¶ 3102(c). By contrast, a full MEBR is primarily used to refer a member for PEB evaluation and may be referred to a PEB by the panel of medical providers that is within the MTF. MANMED art. 18-1(3)-(4). If an AMEBR recommends placing an officer on LIMDU, the AMEBR must be forwarded to headquarters for departmental review. *Id.* at art. 18-17(1)(c). Headquarters may then approve assignment to, or removal of the officer from, LIMDU; headquarters may also evaluate the AMEBR to determine if submission of an MEBR to a PEB is appropriate. MARADMIN 0636-09(5)(D)(5).

A review of the record indicates that a MEB was convened on September 22, 2009, and the AMEBR signed by Commander Finley as the CA recommended that Colonel O'Brien be placed

---

[11] "An MEB may be ordered (or convened) by the CMC . . . or the commanding officer of the MTF in which the Marine is a patient." MARCORSEPMAN ¶ 1802(3). "Separation will not be effected when . . . MEB action" is contemplated. *Id*. at ¶ 1011(3).

on LIMDU.  Captain Adams determined that only a 60-day "medical extension" was appropriate and that at the expiration of that period, Colonel O'Brien was fit for duty.  In this regard, the MARADMIN provision regarding medical extensions states that:

> Extension of active duty service for a maximum of 60 days to evaluate and document a marine's condition upon the completion of active service or determine if a marine should be retained on limited duty for possible future processing through the DES.  This places a marine in convenience of the government medical status (COFGM).

MARADMIN 0636-09(3)(A)(7).  There is no indication in the record that a PEB should be ordered or was required. While the MEB recommended a referral to a PEB, that recommendation was not acted upon by Captain Adams nor was it signed and acted upon by Commander Finley, as the CA.  Plaintiff is incorrect in asserting otherwise and, particularly, in indicating that the Navy's regulations precluded Captain Adams from exercising authority to not refer Colonel O'Brien to a PEB.[12]  Based upon the record, the BCNR properly concluded that Colonel O'Brien did not suffer from any unfitting condition at the time of his transfer on November 30, 2009.

   Colonel O'Brien asseverates that, by agreeing to be put on active duty for further evaluation, he was entitled to be processed through the DES.  He asserts that he completed a form indicating that he did not want to be deactivated (released from active duty orders), and that he did not waive his right to stay on active duty to complete his medical treatment and disability processing.  But, the evidence in the administrative record indicates otherwise and demonstrated that Colonel O'Brien did not need to be retained on active duty past that date for further evaluation.  Because Colonel O'Brien was an officer, the MEB was required to forward its AMEBR recommending LIMDU to headquarters for departmental review.  Captain Adams determined that a 60-day extension was appropriate, rather than LIMDU, to allow Colonel O'Brien to recover from acute pain.  Captain Adams had the authority to determine that Colonel O'Brien was fit for duty after the 60-day extension.  Importantly, Captain Adams was not required to grant the period of LIMDU or to refer Colonel O'Brien to the PEB.

---

[12] Captain Adams's discretion in this regard was made clear in the MANMED –

> **Care at the end of active duty.**  Marine and Navy members in the waning aspects of their service facing non-punitive separation, whether due to voluntary longevity retirement, or voluntary separation at end of active obligated service (e.g., EAS or EAOS) . . . often encounter situations requiring a difficult resolution of whether a health problem should force their being retained on active duty beyond the previously established date of separation. . . .  Accordingly, when a separation or retirement date has been established, every effort must be made to effect the servicemember's discharge on that date.  Only the respective service headquarters can alter a servicemember's date of discharge.

MANMED art. 18-25(1).

Additionally, while the October 20, 2009, draft MEBR was included in the administrative record, it was neither signed by Captain Adams or by Commander Finley, the CA on the AMEBR and the listed CA on the MEBR Cover Sheet.  There is no indication that the draft MEBR made its way to Captain Adams for review.  Additionally, the information contained in the draft MEBR Cover Sheet is contradicting.  While on the one hand, it includes the indicated disposition "Refer to PEB," it, on the other hand, includes that Colonel O'Brien was counseled of the finding that he was "Fit for Full Duty."  None of this indicates that Captain Adams was required to refer Colonel O'Brien to the PEB.  Based on the foregoing, the court concludes that the USMC complied with the procedures set forth in the relevant statutes and regulations.  Accordingly, the court concludes that the BCNR properly found that Colonel O'Brien was properly transferred from active to reserve status and properly did so without further disability screening.

### (2)      Substantial Evidence Supports the BCNR's Decision

Colonel O'Brien's next claim is that substantial evidence did not support the BCNR's decision.  Contrary to plaintiff's claims, the court finds that the BCNR's finding was not arbitrary, capricious, contrary to law or otherwise unsupported by substantial evidence.  In this regard, it is important to understand the limited nature of the review associated with the BCNR's ruling.

Judicial review of a military review board decision is conducted under the same standard as any other agency action, that is whether the decision is arbitrary, capricious, unsupported by substantial evidence, or contrary to law.  *See Metz*, 466 F.3d at 998; *see also Hatmaker*, 117 Fed. Cl. at 565-66; *Silbaugh v. United States*, 107 Fed. Cl. 143, 149 (2012) ("The court reviews the . . . decision under a standard . . . [that does] not disturb the decision of the [board] unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence.").  In particular, the "responsibility for determining who is [F]it or [U]nfit to serve in the armed services is not a judicial province; and [] courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence."  *Heisig*, 719 F.2d at 1156; *see also Hoffman v. United States*, 560 Fed. Appx. 987, 991 (Fed. Cir. 2014).  Nor is this court a "super correction board," with responsibility for determining whether an officer is fit to serve.  "Fit" and "Unfit" are terms of art within the DES and the court will not substitute its judgment for that of either the military review board or the decisions made by qualified medical evaluators.  *Hoffman*, 560 Fed. Appx. at 991; *Hatmaker*, 117 Fed. Cl. at 566; *Frey v. United States*, 112 Fed. Cl. 337, 346 (2013).

It is peradventure that Colonel O'Brien's physicians and other Navy personnel were concerned about his fitness for continued duty.  While the October 20, 2009, report recommended referral to a PEB, under the regulations, Captain Adams had the authority to determine whether to allow this referral, *vel non*.  There is no evidence in the record – let alone any contrary substantial evidence – to suggest that the BCNR did not understand Colonel O'Brien's health status and the basis upon which it could determine whether he was fit or unfit for continued service.  *Hoffman*, 560 Fed. Appx. at 991.  In this regard, the Navy Board is not required to list everything it considers, only the essential facts supporting the denial – the "reasons need not be expressed in great detail."  *Boyer v. United States*, 323 Fed. Appx. 917, 920 (Fed. Cir. 2009); *see also*

*Buchanan v. United States,* 621 F.2d 373, 383 (Ct. Cl. 1980); *Craft v. United States*, 544 F.2d 468, 474 (Ct. Cl. 1976).

### (3)   Constructive Service – Remedy Unavailable

Finally, Colonel O'Brien asserts that he should be reinstated on active duty retroactively, entitling him to active duty "back-pay" from the date he was transferred from active duty to the reserves "until completion of his medical processing." Contrary to plaintiff's claim, Colonel O'Brien's retention on active duty was not mandatory and he was lawfully separated. There is no basis to conclude that Colonel O'Brien should be returned to active duty with service credit and back pay from November 30, 2009, as he contends. *See Barnick*, 591 F.3d at 1379; *Stuart v. United States*, 100 Fed. Cl. 74, 77 (2011); *see also Metz*, 466 F.3d at 998.[13] Here, contrary to plaintiff's claims, the medical disability proceeding here was properly conducted and completed. There is no basis under equity or the law to conclude otherwise, and, in particular, provide for some indefinite and undefined term of service. *See Strahle v. United States*, 602 F.2d 344, 347 (Ct. Cl. 1979); *see also Arroyo III v. United States*, 116 Fed. Cl. 691, 698 (2014); *Cooper v. United States*, 113 Fed. Cl. 165, 170-71 (2013); *see generally, Grooms v. United States*, 113 Fed. Cl. 651, 661-62 (2013).

### III.   CONCLUSION

The court will not gild the lily. Based on the foregoing, the court **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's cross-motion. No costs.

**IT IS SO ORDERED**.

                                                  s/Francis M. Allegra
                                                  Francis M. Allegra
                                                  Judge

---

[13] In *Barnick*, the Federal Circuit held that the application of the constructive service doctrine was limited to restoring a successful litigant to the position that he would have occupied but for their illegal release from duty. 591 F.3d at 1379. That is not consistent with the relief Colonel O'Brien has requested. *See Christian, II v. United States*, 337 F.3d 1338, 1347 (Fed. Cir. 2003), *cert. denied*, 541 U.S. 972 (2004).